The last matter for argument this morning is Smartran, Inc. v. Alpine Confections, Inc. at Al. Mr. Basinski. Good morning, Your Honors. My name is Anthony Basinski, and I represent the appellant, Smartran, Inc., and I would respectfully request two minutes for rebuttal. Minutes? Two minutes, yes, Your Honor. Go ahead. Your Honor, Your Honors, the issue that the court has raised in the letter we received the other day, I think it is an important issue in this case because it helps me explain to you what this case is about and what this contract is intended to say. You want to speak up a little bit? I'm having trouble hearing. I'm sorry, Your Honor. Let me adjust the microphone. Is this any better? Yes. All right. Okay. It helps me explain what this contract is about and what this case is about. The court has raised the issue as to whether there is diversity of jurisdiction in this case. I'm assuming what the court means by that is whether we met the requirement of $75,000 rather than whether there is actual diversity between the parties. No. I'm speaking only for myself. Let me just throw this out. I do not believe principled place of business was pleaded anywhere, and I do believe we have case law suggesting that it should be. Your Honor, I think that they admitted in their answers that their principled place of business was in some state other than the state of Pennsylvania. I think each of the defendants is located in another jurisdiction. The Flowers defendant is in New York. The Alpine defendants are all in Utah. So I think that those were admitted in terms of the jurisdictional issue as far as diversity is concerned. I'll look at the answer, but I emphasize that my emphasis is on the word principled, and I don't recall that having been. Your Honor, I think it has been. I'd be happy to address the issue in a subsequent brief if the court would like that, but I believe it has been pled and also has been admitted by the defendants. With respect to the issues in this case, Your Honors, I think the principled issue is did the district court apply the correct standards of review in making his decision with respect to whether this contract required payment for three years or whether it did not require payment for three years. And in making that determination, I think the court looked at the evidence in the most favorable light to the defendants rather than to the plaintiff, Smartran. I think the court looked at a very narrow section of the contract that said savings affected by Smartran. It ignored the rest of the contract. It basically says that that language controls, nothing else is relevant. And that's just not the case, Your Honors. The language of Section 2 of the agreement itself specifically says, in the event that the client, in this case Alpine, during the term of this consulting agreement obtains a rate discount increase. You want to get your voice up, please, sir. We can't hear you. I'm sorry, Your Honors. I have a very bad cold, so I appreciate the court's indulgence. In the event that the client, which is Alpine, during the term of this consulting agreement obtains a rate discount increase or a decrease in applicable rates, the fee set forth in the consulting agreement shall be payable to Smartran. It doesn't talk about savings affected by Smartran. Although what we're looking for in this case, Your Honor, very clear, we're not looking for any additional recoveries or savings that were achieved by the defendants on their own. We do say we're entitled to those savings that we were responsible for for three years. They only paid us for 18 months. So we're looking for an additional 18 months with respect to what we're entitled to. And I think we're… Well, help me there. Now I'm confused. I thought from your main brief, I thought your position was that there was no causal requirement here. Correct, Your Honor. But in your reply brief, referring to the second sentence of paragraph two… Yes, Your Honor. You say, That is why the 36-month period for payment of its fee in the consulting agreement to protect Smartran's fees so long as the defendants have better rates than they did before using Smartran's recommendations. It is limited in time and in scope. It applies only for 36 months, and it applies only to the level of savings resulting from Smartran's recommendations. That's correct, Your Honor. Now, which is your position? Is it that there's no causal connection, or is it that your client is entitled only to the level of savings resulting from Smartran's recommendations? That is our position, Your Honor. It's only the level of savings that we were responsible for, and that level of savings would continue onward. Let me use it as an example, Your Honor, what happened here. I think it may clarify the situation. Let's assume that there was a package that was $10 to ship from Pittsburgh to Philadelphia before Smartran became involved. Smartran becomes involved, they obtain a discount of $7.50. We're entitled to 50% of the $2.50, or $1.25. Now, defendants go off and negotiate a new contract with UPS to get an additional discount from $7.50 to $5. We're not saying we're entitled to that additional discount. We are saying that there was a building block that we were responsible for that the defendants used our recommendations for to get that first discount upon which they built the second discount. I think that's what the court ignored. I think that's what is one of the bases for our claims in this case. We're also suggesting to the court that the court ignore the fact that they did use our recommendations. There were negotiations, despite the finding by the district court, but there were no negotiations. We have two emails, one from the chief financial officer of the defendant, another from one of the other employees, specifically referencing the fact that there were negotiations of the 2006 contract with UPS. They say they didn't use our recommendations on it. They did use our recommendations for the very reason I've just described. They got a discount from us to begin with. They got an additional discount from UPS, but wouldn't have gotten the full $5 if we had gotten $2.50. So they used our recommendations. There's evidence to that effect. The district court dismissed the negotiations issue by saying, well, they're playing a suggestion. They're suggesting that there were negotiations. I don't think that's the case, Your Honors. I think when you have two pieces of evidence from the defendants themselves referred to negotiations, I think those are admissions. I think those are admissions that bind them and shouldn't be dismissed as suggestions. Same with regard to the use issue. I think the district court looked at the evidence in the light most favorable to the defendants rather than with respect to the plaintiff's Smartran. They did use the recommendations. They didn't sit down and say, here are the recommendations to UPS, but they did give them shipping characteristics. They gave them information concerning revenues, and all that information derived from the historical cases that had been established based upon the recommendations of Smartran. So they did use them, didn't use them directly. They did use them. Now, with respect to 1-800-Flowers, it's a little different situation. They had their own contract with UPS. We acknowledge that. It was a factual question, however, as to whether when Flowers acquired the stock of certain of the subsidiaries, Harry London and Fannie Mae, whether those companies actually ever became part of that new or that old contract with UPS that 1-800-Flowers had. That agreement required written documentation. No written documentation was ever produced. I deposed the UPS representative, part of the record in this case. It shows that he had no knowledge of any written documentation ever actually joining those parties as a party to the UPS agreement with Flowers. Similarly, with regard to Flowers, they acquired all the stock of Alpine, of these two subsidiaries, which had been spun off from the original Alpine. When they did that, they acquired all the contracts, including this contract, the consulting agreement with Smartran. That contract was described as a material, valid, enforceable contract. They're responsible. They're liable. Under the theory that under the acquisition of stock of a company, you get that company's assets, but you also get that company's liabilities, and they acquired those liabilities, including this contract. So they can't duck behind and say, well, we've got a new contract. We're not responsible in the old contract with UPS. It's no different than if Flowers had a contract supplying them with – Alpine had a contract with a chocolate supplier, supplying them with chocolate. That contract should continue despite the sale of stock. They can somehow abrogate that contract just because there's a new party involved. Same true here with regard to Flowers. It can't abrogate the contract with Smartran just because they acquired the stock and they have their own contract. That contract is still a valid contract. It's acknowledged to be a valid contract, and it should have been enforced by the district court. Now, if the court has any other questions, I'll be pleased to answer those questions. I'm content. Thank you very much. Thank you. We'll have you back in a little bit. Since he has Dodge. May it please the court, I'm Patricia Dodge. I'm here representing all of the appellees, 1-800 Flowers, Harry London, Fannie Mae, Ken Craft, and Maxfield. Because the court did ask us to address the issue of jurisdiction in this case, I would note, as Judge Smith noted, that with respect to one of the defendants, Harry London, I believe that our answer does not expressly state that it is an Ohio corporation, but I will note for the court's convenience that that is, in fact, in the record, and that is in the record actually in the record below at docket number 88 where there is an indication that Harry London is an Ohio corporation. Because the court did ask us to look at this issue, I do want to raise one other issue that does relate to the amount in controversy. We believe there is an issue as it relates to the amount in controversy because we have five separate parties, all of who are alleged to have been part of a contract, but only one of whom actually is. As our research has indicated, the Third Circuit has yet to rule on the issue of what some circuits have called aggregation, but in the Golden case in 2004, the court did discuss the issue of whether multiple defendants, the claims against multiple defendants can be aggregated for purposes of finding jurisdiction. In this instance, the complaint merely alleges that defendant Alpine entered into a contract, that Alpine started to pay, stopped paying, and then there is a final allegation that all defendants are liable for Alpine's breach of contract. In looking at this issue, it does not appear that there has been any allegation of joint and several liability, which the Golden case discussed as being one way to look at this and a better way than just calling it aggregation. So if you look at that, clearly the court has jurisdiction over Fannie Mae, which was formerly Alpine, and Flowers due to plaintiff's allegation in this case that Flowers is now responsible for Fannie Mae's contract. We do believe there is issue as to whether diversity jurisdiction or the subject, the amount of controversy does exist as to the remaining three defendants because there is clearly, if you look at the complaint, no joint and several liability alleged, nor could subsidiaries who are not parties to a contract be liable for the breach by its parent. Having discussed that issue, I'd like to move on to the substance of our argument because I think it's clear that if you adopt the analysis urged on this court by SmartTran, you would have to have a finding that's completely contrary to any law, that in fact parties who are not, entities who are not parties to a contract can nonetheless be liable under the contract. A result we suggest is never the case. You would also have to ignore the plain meaning of this unambiguous contract taken as a whole and do as SmartTran has done, and that is to separate out and isolate several portions of that without looking at the contract as a whole. In this case, the district court did find two important things. One, the contract isn't ambiguous, and I note that's a result that SmartTran agrees with. They move for a cross-summary judgment. The court also found there was no breach. Well, how did the court get there? It looked at all the terms of the contract, construed them together as it was required to do, and looking through all of the provisions of the contract found that clearly the way the contract reads is that SmartTran is entitled to its fees only as long as the savings achieved by Alpine under the contract were as a result of its recommendations. In doing that, the court properly concluded that based on the various provisions of the agreement that said that, there was no breach because the various defendants and Alpine paid those fees as long as they were achieving savings through SmartTran's recommendations. When they were no longer doing so, they properly stopped paying. There was no longer an obligation. And as the court noted, SmartTran could have included other provisions to include the things that it didn't, but the silence of the contract on this issue doesn't mean it's ambiguous and doesn't mean that the court can rewrite the terms. Now, I want to turn briefly to the other defendants who weren't parties to the contract. With respect to Kencraft and Maxfield, they were never parties to the contract. They were at the time a subsidiary of Alpine, which was the contracting party. In fact, SmartTran invoiced Alpine. And so if the contract applies to the subsidiaries, which is the way it reads, it merely means that the subsidiaries, as long as they were enjoying the savings through the recommendations, would achieve savings, but it was Alpine that was the party bound, not any of the subsidiaries who weren't parties to the contract. Once Alpine and once Kencraft and Maxfield were spun out of the Alpine group, they no longer were subsidiaries, therefore the contract didn't apply to them at all. And further, it's undisputed in the record, despite SmartTran's allegations to the contrary, that even if you could find that Kencraft and Maxfield at one time were parties to this agreement, which we suggest you could not find, they, as of a certain point in time, the point in time when they stopped paying, in fact, were no longer using SmartTran's recommendations. They entered into a new agreement with UPS because UPS, a third party here, canceled the contract that SmartTran had helped to negotiate. Yes, but wasn't the basis of the original contract part of what was renegotiated with UPS? It was not, Your Honor. What I would suggest there is that there were still an agreement with UPS. However, the recommendations made by SmartTran for savings had no bearing whatsoever on the new contract between these parties that had been spun out and UPS. Wasn't the example given by Mr. Vizinski applicable here? I don't believe it is for the following reason. UPS merely canceled the contract, drafted a new one, used the parties' historic shipping characteristics and market rates, not rates before. They testified, unrefuted by anyone, that in fact they didn't consider the 2005 agreement, they didn't look at it at all, that in fact this was imposed upon these parties and they accepted it without any negotiations whatsoever. So our position in that is that the SmartTran recommendations were of no moment whatsoever in connection with Kencraft and Maxfield. So with there no longer being any use of any recommendations by SmartTran, the obligation, assuming Kencraft and Maxfield had one to SmartTran, which is a threshold issue, were extinguished at that point in time. The contract that they helped negotiate wasn't in existence anymore. What do you say to the, I apparently, I confess, I think I misunderstood. I thought the argument was that a causal connection between the recommendations and the savings was not required at all. But I now understand, as stated in the reply brief, that what they're saying is yes, it takes a causal saving, a savings causally connected to SmartTran's recommendations. But once that happens, the contract says you've got to pay for 36 months, whatever happens down the line. What do you say to that? That certainly is SmartTran's position. That was rejected by the court below. And I think in doing so, the court construed instead of looking at that single you have a three-year requirement, they said you have a three-year requirement as long as the savings that are affected were affected through SmartTran's recommendations. So in other words, the contract has a limit of a three-year term. However, every provision virtually in there talks about savings affected by SmartTran, savings as a result of SmartTran's recommendations. So once that underpinning is removed, while there was a three-year term, then you get to a point where if you are not utilizing those recommendations to achieve savings, the fundamental purpose of the contract is no longer being met and therefore there is no further requirement to make payment to SmartTran. Isn't the question of what affected the savings a genuine issue of material fact that the jury should determine? We don't believe so here, Your Honor, because we have, again, unrefuted testimony as to how savings were earned after there was a reorganization. And remember, it's not the reorganization that stopped the process and ended the savings. It's that the recommendations were no longer used to achieve those. In the case of 1-800-Flowers, it had a preexisting agreement with UPS and no involvement whatsoever with SmartTran. So there's no issue that SmartTran had anything whatsoever to do with its preexisting contract. It then brought Fannie Mae and Harry London into its agreement. Again, while SmartTran attempts to create an issue of fact on this point, in fact there is no genuine issue of fact that both of these parties were, in fact, added to the existing Flowers-UPS agreement. Now, SmartTran points to the fact that you said there's an agreement, but no such agreement was produced. Well, the contract between UPS and Flowers does state that there will be a writing. It doesn't suggest, I don't believe, a particular writing. But there's no question that both parties of that contract agree and stated so under oath that these entities were, in fact, added to the contract. And I believe there are emails that go back and forth. There certainly was not a written addendum. But when both parties do an agreement, agree that, in fact, subsequent parties were added, I don't believe that it creates a material issue of fact that they chose to do it in a perhaps slightly different way than their contract allowed. Now, I do want to spend a small amount of time, if I can, on 1-800-Flowers because I think it would be an amazing stretch of the facts and the law in this case to suggest that 1-800-Flowers, which had nothing whatsoever to do with SmartTran at any point in time, somehow became liable under the contract between SmartTran and Alpine merely because it purchased the stock of Alpine's successor, Fannie Mae, and Fannie Mae's subsidiary, Harry London. The mere purchase of stock of another corporation does not, in fact, give the purchaser any liability for the subsidiary's contracts. Both of these companies that were purchased by Flowers remained in existence. They still remain in existence and operate separately to this day. And there's no argument of piercing the corporate veil or that somehow there's an agency relationship that would find otherwise. Instead, what SmartTran has attempted to do is suggest that because in the stock purchase agreement, the SmartTran contract, which was a valid enforceable contract at that point in time, was listed as a material contract, does not suggest that it was assumed or assigned to 1-800-Flowers. Certainly if it was, there would be a provision in the contract of that effect. Instead, it merely suggests that these were, during the due diligence, identified as material contracts of the company, the company being Fannie Mae, not 1-800-Flowers, and that they were, in fact, identified in the contract. That cannot, and the law, in fact, cited by SmartTran doesn't stand for the proposition that a purchaser of stock becomes liable for the various contracts of the subsidiaries that it purchases. So in our view, with respect to 1-800-Flowers, there can't be any argument that it was ever a party to any agreement with SmartTran, and therefore there can be no liability to that or any other party in this matter. For that reason, we respectfully request this court to affirm the decision of the district court and on behalf of all parties and find that the summary judgment on their behalf was appropriately entered. Thank you very much. Thank you. Thank you, Ms. Dodge. Mr. Buczynski, rebuttal. Thank you, Your Honor. Let me just briefly address the last issue raised by Ms. Dodge with respect to 1-800-Flowers. I think the law is very clear that if a company acquires another company, including its subsidiaries, and acquires its stock, it does take with it its liabilities and its contracts. I think that's basic corporate law 101 as far as I'm concerned. With respect to the issue of whether the Maxfield and Kencraft defendants are liable, because they were somehow separate, well, they benefited from the recommendations. And there's a law which we cited in the Seventh Circuit case, Zurich American v. Watts, that says that even a non-signatory can be held liable on a contract if it benefits from the contract. It's sort of a third-party beneficiary analysis, but not quite that analysis. We don't need to reach that at this point either. Your Honor, I think with respect to the issues that Ms. Dodge has addressed, we addressed in our brief, and I think I will rest upon the brief at this point. If the Court would like additional briefing, however, on the issue of jurisdiction, I'd be happy to address that. Otherwise, Your Honors, I request that the Court reverse the granting of summary judgment in any judgment in favor of a smart charge. Thank you, Your Honors. Thank you. Thank you, Mr. Sensenbrenner. We thank both of the counsel for their arguments. We'll take the matter under advisement, and we will pass the third majority proceeding.